**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) Case No. 4:18-cv-_____ |
| v. | ) ) |
| JOHN D. SCHILLER, JR. | ) ) |
| Defendant. | ) ) |

**COMPLAINT**

Plaintiff, Securities and Exchange Commission ("Commission") alleges:

**SUMMARY**

1.     This matter concerns federal securities law violations from 2012 to 2016 by John D. Schiller, Jr. ("Schiller" or the "Defendant") during his tenure as CEO and chairman of the board of Energy XXI, Ltd. ("EXXI"), a publicly traded oil and gas exploration company.  During this period, Schiller obtained $7.5 million in undisclosed loans from several outside vendors of EXXI in exchange for awarding these vendors with EXXI business.  Schiller failed to disclose these loans in connection with EXXI's October 10, 2014 definitive proxy statement that did not disclose EXXI's business with those vendors as related-party transactions.  In addition, Schiller obtained a $3 million loan from Norman M.K. Louie ("Louie"), a portfolio manager at Mount Kellett Capital Management, LP ("Mount Kellett"), a registered investment adviser and EXXI's largest shareholder, approximately two months before Louie joined the EXXI board as an outside director.  Schiller failed to disclose the loan from Louie in connection with EXXI's Form 8-K, dated December 15, 2014, announcing Louie's appointment as a board member despite the fact

that the loan compromised Louie's independence.  Finally, Schiller charged over $1 million in expenses to his corporate credit card that was paid directly by EXXI.  These expenses were in fact, either personal in nature or in violation of EXXI's policies.  As a result, for the years 2012 to 2016, Schiller solicited definitive proxy statements which materially understated his compensation by omitting amounts that he received for personal expenses, such as lavish parties at his ranch, trips to major sporting events, and expensive gifts.

2.      By engaging in such conduct, Schiller violated Section 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)], Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78n(a)], and Exchange Act Rules 14a-3 [17 C.F.R. §240.14a-3], and 14a-9 [17 C.F.R. §240.14a-9].

3.      Unless enjoined, Schiller is likely to commit such violations in the future.  He should be enjoined from doing so, prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. §78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. §78o(d)], and ordered to pay appropriate civil money penalties.

**JURISDICTION**

4.      The Court has jurisdiction pursuant to Securities Act Section 22(a) [15 U.S.C. §77v(a)] and Exchange Act Sections 21 and 27 [15 U.S.C. §§78u and 78aa].  The Defendant made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with his acts, transactions, practices and courses of business alleged herein.

**VENUE**

5.      Venue lies in this Court pursuant to Exchange Act Section 27 [15 U.S.C. §78aa] and Securities Act Section 22(a) [15 U.S.C. §77v(a)] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

**DEFENDANT**

6.      John D. Schiller, Jr., age 59, is from Houston, Texas.  Schiller was the founder, president, and chief executive officer of EXXI from its founding in 2005 until its dissolution in December 2016.  From 2005 until October 2015, he was also the chairman of EXXI's board of directors.  From January 2017 until February 2017, he was the chief executive officer of EXXI's post-bankruptcy successor entity.

**RELEVANT ENTITY**

7.      Energy XXI, Ltd., incorporated as an exempted company under Bermuda law, was an independent oil and natural gas exploration and production company headquartered in Houston, Texas.  Founded in June 2005, it became one of the largest producers of oil and gas on the shelf of the Gulf of Mexico.  From August 2007 to May 2016, EXXI's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on NASDAQ and traded under the symbol "EXXI."  During the relevant period, EXXI had a market capitalization of approximately $2 billion.  On April 14, 2016, EXXI and 25 affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On December 13, 2016, EXXI's plan of reorganization was confirmed by the Bankruptcy Court and became effective on December 30, 2016, whereupon EXXI was dissolved and its assets vested in a new entity.

## FACTS

**A.     Schiller's Loans from Vendors in Connection with EXXI Business**

8.     Throughout Schiller's tenure as CEO, he maintained an extravagant lifestyle that required him to spend millions per year on expenditures relating to his mansion, a sprawling ranch, racehorses, and generous donations to Schiller's alma mater, Texas A&M University.

9.     In order to finance his lifestyle, in March 2010, Schiller opened a margin account that was secured with his stock portfolio, the majority of which was EXXI stock.  By February 2014, he had borrowed over $23 million against the margin account and the account was highly leveraged.  Schiller's financial advisor warned him at this time that if EXXI's stock price dropped by more than $2.60, his accounts would be in a margin call.

10.     Starting in February 2014, Schiller faced the prospect of selling significant blocks of his EXXI stock to satisfy margin calls if its price declined.  Between May and October 2014, Schiller received a series of margin calls.  In order to avoid selling his EXXI stock and causing a further share price decline from the CEO selling his shares, Schiller, while CEO and Chairman of the board, obtained $7.5 million in personal loans from three company vendors.  Following their loans, EXXI awarded these vendors new business and/or better terms on existing business. Schiller failed to disclose the loans to EXXI.

11.     As a result of the loans, Schiller had a material interest in the vendors' business with EXXI because he received the loans in exchange for future EXXI business or favorable terms of business to the vendors.  EXXI's business with these vendors therefore, constituted "related party transactions" as defined by Item 404(a) of Exchange Act Regulation S-K [17 C.F.R. §229.404(a)] and should have been disclosed as such in EXXI's October 10, 2014 definitive proxy

statement.  However, Schiller failed to disclose the loans to EXXI and thereby, prevented it from disclosing the related party transactions.

**First Related Party Transaction: Vendor A**

12.     In February 2014, Schiller approached the two owners of Vendor A to obtain a line of credit.  Vendor A was a privately held drilling rig company which sought to do business with EXXI.  Schiller needed a loan from the owners of Vendor A because he had spent too much money and reached his limit on funds that could be borrowed against his pledged securities in margin accounts.  Contemporaneous emails reflect that the owners of Vendor A believed that the loan to Schiller was being given in exchange for EXXI business.  On February 12, the owners of Vendor A discussed:

> "As you know, we are not going to be able to nail down a contract before this [line of credit] and we are going to have to take his word on it, of which a[sic] feel comfortable that it will happen.  When I talk to [Schiller], I am going to stress the importance of ALL future work (current as well if we can kick out [our competitor] on their rig move) as our security in this loan."

13.     On February 21, 2014, Schiller signed a line of credit agreement with one of the owners of Vendor A with an interest rate of 5%.  Schiller took his first draw of $1 million on March 12, 2014.

14.     On May 12, 2014, the owners of Vendor A emailed Schiller to see if he "had any movement on any of the contract stuff we have talked about" and whether there was anything they could "be doing on [their] end to speed the process . . ."

15.     On May 14 and 20, 2014, Schiller borrowed another $500,000 from the same owner of Vendor A.  During this time, Schiller advocated that EXXI use Vendor A for a new-build rig project even though a competitor had underbid Vendor A by several million dollars.  For

example, on May 13, 2014, Schiller pressed a senior EXXI officer in charge of procurement for comparable details on Vendor A's bid when its competitor's rate was $7.3 million less over two years.

16.     On May 31, 2014, one owner of Vendor A, in an effort to outbid a competitor, sent Schiller a text asking whether reducing the day rate price on its bid by $5,000 would "lock it in" for securing business with EXXI concerning a rig for a well location known as "South Pass 49." Schiller responded that the price reduction would help.

17.     When Schiller's efforts failed to produce a contract, the owner of Vendor A demanded his money back.  In a June 30, 2014 e-mail to Schiller's financial advisor, who served as the intermediary for the loan and also served as a financial advisor to Vendor A, the same owner of Vendor A demanded that Schiller immediately repay the loan as a consequence of EXXI not providing a rig contract to Vendor A, stating: "If my interest isn't paid today and a contract SIGNED, I'm calling my loan back, NO EXCEPTIONS!!!!"  In the same e-mail chain, the other owner of Vendor A stated "We need a yes or no on the new build [EXXI project] so we know how to handle the loan [...]."

18.     Schiller failed to disclose the loan with the owner of Vendor A in an officer and director questionnaire dated July 21, 2014 that specifically asked about related party transactions, potential conflicts of interest, and relationships with people who did business with EXXI.

19.     The owners of Vendor A continued to grow frustrated with Schiller's inability to deliver business to their company.  On September 4, 2014, one of the owners of Vendor A again wrote to Schiller demanding repayment on the line of credit noting: "Your people couldn't give us a commitment for the workover rig so we laid the crews off and are taking the rig off the market

until we have a 1 year contract.  We have had no movement on doing any business with your company which is very disappointing to me."

20.     Two weeks later, on September 18, 2014, EXXI entered into an Engineering Services Contract with Vendor A.  On October 24, 2014, EXXI signed a contract with Vendor A for a workover rig for a well location known as "South Pass 78."

21.     In all, EXXI paid $7.2 million to Vendor A following the loan to Schiller.

**Second Related Party Transaction: Vendor B**

22.     On August 15, 2014, after receiving a margin call in connection with EXXI's stock price dropping by 25%, Schiller obtained a $3 million loan from Vendor B.

23.     Vendor B is a broker and provider of oil rig service vessels in the Gulf of Mexico. Vendor B procured boats for EXXI pursuant to a Master Service Agreement.  Vendor B and EXXI had a pre-existing business relationship going back to 2010, wherein Vendor B charged EXXI 10% of the boat rental as a brokerage fee which was higher than what other brokers charged.  Payments to Vendor B constituted a significant part of EXXI's total budget for capital expenditures.

24.     By the summer of 2014, however, EXXI's procurement department wanted to reduce EXXI's reliance on Vendor B given that EXXI had developed in-house capabilities to manage its transportation needs and because Vendor B's brokerage fee was above prevailing market rates.  Specifically, by August 2014, the senior EXXI officer in charge of procurement sought to renegotiate the Master Service Agreement to reduce Vendor B's brokerage fee to between 3% and 5%, which was more in line with market rates, and reduce EXXI's relationship

with Vendor B by handling more of EXXI's boat procurement internally.  As reflected in a draft letter from EXXI to Vendor B, EXXI sought to reduce the fee from 10% to 5%.

25.     In September, following the loan and after becoming aware of the same EXXI officer's plan to seek a lower brokerage rate, Schiller directed him to preemptively increase EXXI's offer from a 5% to a 6% rate.  The same EXXI officer complied with the directive, leading Vendor B to accept the offer.

26.     From the time of the loan until November 1, 2015, when Vendor B ceased brokering EXXI boats, EXXI chartered approximately $39 million in offshore service vessels and paid Vendor B associated brokerage fees.

**Third Related Party Transaction: Vendor C**

27.     In September 2014, after EXXI's stock price fell to $9 a share triggering more margin calls, Schiller, through an intermediary who served as the financial adviser for both Schiller and the owner of Vendor C, approached the owner of Vendor C for a loan.  According to Vendor C, the intermediary advised that, in exchange for a loan, Schiller would make Vendor C the exclusive liftboat provider for EXXI and enhance Vendor C's prominence in the industry.  Vendor C leased liftboats (self-propelled floating barges with cranes) to various companies including EXXI.  It also leased offshore service vessels to EXXI through Vendor B.

28.     The owner of Vendor C loaned Schiller $1.5 million on September 23, 2014 and another $1.5 million on October 2, 2014 pursuant to written agreements.

29.     On October 18, 2014, the owner of Vendor C learned that he had an unsuccessful bid for a liftboat job from EXXI.  Schiller became aware through the intermediary that the owner

of Vendor C was very disappointed in not obtaining the liftboat business.  Schiller responded to the owner of Vendor C through the intermediary advising that the owner should continue bidding. Schiller then forwarded the e-mail to EXXI's officer in charge of production and operations.

30.      By late October, Schiller directly ordered the senior EXXI officer in charge of procurement to hire Vendor C during a lunch at Morton's Steakhouse.  At the lunch, Schiller "dove right into it and basically said, you know, 'Hey, you need to start using [Vendor C].'"  When the officer questioned him, Schiller responded that "[w]ell, this is the way things work in a small oil company."  The officer documented the discussion in a contemporaneous email stating "JDS [Schiller] ordered me to give [Vendor C] a liftboat job."

31.      Vendor C obtained some liftboat business from EXXI, but not the amount its owner expected in exchange for the loan to Schiller.  As a result, the owner of Vendor C demanded immediate repayment on the loan.  On November 3, 2014, he texted Schiller's financial advisor that he "lost another E21 job to [another vendor] and I'm tired of being lied to.  Tell John [Schiller] I want my money back and he'll be receiving a demand letter shortly."  Three days later, Schiller sent a text to Vendor C: "I'm going to call [Vendor B] and make something happen" – meaning that EXXI would hire Vendor C's service boats through its Master Service Agreement with Vendor B.

32.      In December 2014, immediately following a $210,000 one-day loan to Schiller from the owner of Vendor C, Schiller, again, tried to steer EXXI business to Vendor C.  Schiller directly called an EXXI procurement employee—with whom he rarely communicated—and asked him why EXXI had not awarded business to Vendor C.

33.     In the three quarters following the loans, EXXI paid Vendor C over $250,000 for liftboat services.

**Schiller Solicited Proxies Containing Material Omissions**

34.     Schiller failed to disclose the three vendor loans to EXXI notwithstanding opportunities to disclose the loans to EXXI's board or employees who were overseeing the business with the vendors.  The vendor loans at issue – $1.5 million from Vendor A, $3 million from Vendor B, and $3 million from Vendor C – all exceeded the minimum threshold reporting amount of $120,000 on the basis of either the total indebtedness or the size of the transaction. Schiller reviewed and approved EXXI's October 10, 2014 definitive proxy statement, despite the fact that the loans from Vendors A, B, and C were omitted from the disclosure as related party transactions.

35.     On October 10, 2014, EXXI filed its definitive proxy statement which failed to disclose EXXI's related party transactions with Vendors A, B, and C.  Schiller, as CEO, signed proxy solicitation materials that were sent to shareholders with a copy of the definitive proxy statement.

**B.     Schiller's Failure to Disclose the Loan from a Prospective Board Member in Connection with EXXI's Form 8-K Filing**

36.     In October 2014, Schiller obtained a $3 million undocumented loan from Louie.  At the time of the loan, Louie was a candidate under consideration by EXXI to join its board.  Despite having several opportunities to do so, Schiller failed to disclose the loan to EXXI and voted in favor of Louie joining the board.  As a result, EXXI filed a false and misleading Form 8-K on December 15, 2014 that stated "[t]here are no understandings or arrangements between Mr. Louie and any other person pursuant to which Mr. Louie was selected to serve as a Class I director of the

board."  The Form 8-K was misleading because it omitted the $3 million loan that Schiller had

obtained from Louie, which compromised Louie's independence as a board member.

37.     On October 9, 2014, Louie and a co-worker held meetings with several senior

EXXI officers, including Schiller, at EXXI's Houston headquarters.  At the end of the meeting,

Schiller asked Louie for a private discussion.  Outside the presence of others, Schiller requested

Louie to provide him a loan of $2 million.  Schiller advised Louie that he needed the loan to cover

a margin call by a brokerage firm that held his margin account, which was collateralized by EXXI

stock.  Schiller informed Louie that the brokerage firm would sell Schiller's collateralized EXXI

stock if he was unable to satisfy the margin call by the next morning.

38.     On the evening of October 9, 2014, Schiller called Louie and increased the

requested loan amount to $3 million in order to cover the margin call.

39.     The next day, on October 10, 2014, Louie agreed to the loan request by Schiller

and wired $3 million from his personal bank account to Schiller's brokerage account.

40.     There was no written documentation of the loan between Louie and Schiller,

including whether the loan would bear interest or include acceleration provisions or a payoff

date.  In addition, until the SEC commenced an investigation, Louie and Schiller kept the loan a

secret, failing to disclose it to EXXI or the company's board of directors.

41.     By mid-October 2014, Schiller considered Louie to be an official candidate for a

board seat.  Louie began to go through EXXI's formal vetting process required to join the

company's board, including the process of going through interviews with EXXI's lead outside

director.

42.     On November 3, 2014, the nomination committee of EXXI's board of directors had discussions concerning Louie and a second candidate joining the board.  Both Louie and the second candidate, who were not employees of EXXI and did not otherwise have business relationships with the company, were being considered for independent board seats.

43.     In the weeks leading up to Louie's appointment to the board, Schiller failed to disclose the loan in a number of instances that elicited disclosure of the loan.  On December 1, 2014, EXXI's senior legal officer sent Louie an officer and director questionnaire, copying Schiller, which would have elicited disclosure of his loan to Schiller.  Among other things, the questionnaire inquired whether there was any conflict or potential conflict of interest involving any person subject to EXXI's conflict of interest policy and called for Louie to disclose any existing or proposed relationships (other than his service as a board member) between Louie and the company however slight or remote.  Schiller, however, failed to disclose the loan to the senior legal officer or any other officer of EXXI.

44.     During the next several days, EXXI's senior legal officer asked Louie to complete the officer and director questionnaire both in Schiller's presence and by email in which Schiller was copied.  Despite these requests to Louie, Schiller failed to disclose the loan.

45.     In early December 2014, after Louie refused a request from Schiller for a second loan, Schiller considered asking a then current board member for a loan and sought legal advice on this issue from outside counsel.  Outside counsel, who was not told about the loan from Louie to Schiller, advised that a loan from a current board member may be permissible, but may have to be disclosed.

46.     After speaking with outside counsel, Schiller asked Board Member A for a loan. Board Member A, who was also not aware of the loan from Louie to Schiller, refused Schiller's request and advised him that a loan between a board member and a company employee would be inappropriate.

47.     Just prior to a December 15, 2014 board meeting, where the board would take a vote on Louie's appointment, EXXI's senior legal officer reminded Schiller and Board Member A that Louie had not completed a questionnaire.  The full board, which was not told that Louie had not completed a questionnaire, voted to appoint Louie and a second candidate to the board. Notwithstanding the fact that he had obtained a $3 million loan from Louie, Schiller voted in favor of Louie's appointment without disclosing the loan to the board.

48.     Schiller also failed to disclose the loan in connection with the filing of EXXI's Form 8-K and press release announcing Louie's appointment to the board.  On the morning of December 15, 2014, EXXI's senior legal officer sent Schiller and others a draft Form 8-K, stating "[t]here are no understandings or arrangements between Mr. Louie and any other person pursuant to which Mr. Louie was selected to serve as a Class I director of the Board."  Schiller did not respond to this e-mail or otherwise correct the statement in the Form 8-K.  Later that day, EXXI filed the Form 8-K with the same disclosure while Schiller remained silent on the loan.

49.     Later that same day, on December 15, 2014, EXXI filed a Form 8-K announcing the new appointments to the EXXI board and stating the exact language that Schiller was asked to review prior to the filing.  The Form 8-K did not disclose the loan between Louie and Schiller. This statement was false and misleading by omission because the $3 million loan between Louie and Schiller compromised Louie's ability to serve as an independent director of EXXI's board.

50.     The omission of the loan from the Form 8-K was material.  Louie was later

appointed to serve on EXXI's audit committee and compensation committee, which required

independence by Louie  based on the company's public disclosures.  Accordingly, the EXXI board

voted to appoint Louie as a board member on the understanding that he did not enter into any

understandings or arrangements that compromised his independence.   Further, EXXI, as a

company whose stock was listed  on the NASDAQ at the time, was required to meet NASDAQ

listing requirements, including  independence qualifications for directors serving on the audit and

compensation committees.   The   requirements expressly prohibit the existence of any relationship

which in the opinion of the  issuer's board of directors would interfere with the exercise of

independent judgment in carrying   out the responsibilities of a director.

## C.     EXXI's Definitive Proxy Statements for the Years 2012 to 2016 Understated Schiller's Compensation

51.     From fiscal years 2012 to 2016, Schiller obtained undisclosed compensation and

perquisites by submitting business expenses for payment that he knew or should have known were

personal in nature and/or lacked documentation sufficient to establish a business purpose.  As a

result, EXXI, in its definitive proxy statements for 2012-2016, failed to disclose at least $1 million

in excess compensation and perquisites in its executive compensation disclosures.  For these years,

Schiller signed letters to shareholders that included the proxy statements and certified all of the

company's annual Forms 10-K that incorporated the proxy statements.

52.     Schiller provided services to EXXI as its CEO and Chairman pursuant to the terms

of an employment agreement, dated September 10, 2008, which was publicly disclosed.  The

employment agreement provided that each year, EXXI would pay Schiller (a) base compensation;

(b) an annual bonus up to 125% of base compensation; (c) equity compensation in the form of

stock options; and (d) fringe benefits consisting of club memberships, automobile lease, health insurance, and reimbursement of business and health care expenses.  EXXI's definitive proxy statements disclosed that its compensation package for Schiller included standard industry perquisites such as a company-leased car, club membership, and life insurance.

53.     With respect to the business expenses benefit, Schiller's employment agreement provided he would be reimbursed "for all reasonable business expenses incurred by [him] in the performance of [his] duties . . . ."  The employment agreement authorized Schiller "to incur reasonable business expenses for promoting the business of [EXXI], including reasonable expenditures for travel, lodging, meals and client or business associate entertainment."  The employment agreement required that reimbursement requests "be accompanied by appropriate documentation."  EXXI's policies and procedures required Schiller to submit monthly reports of his business expenses and sign the reports before reimbursements could be approved by EXXI's Chief Accounting Officer.

54.     With regard to Schiller's use of the corporate jet, EXXI's policies required Schiller to provide a business justification and to reimburse the company for any additional expenses incurred by his personal use of the aircraft.

55.     For the fiscal years 2012 through 2016, Schiller charged to his corporate credit card over $1 million in expenses that were either personal in nature and/or lacked documentation sufficient to establish a business purpose.  Rather than reimbursing Schiller, EXXI paid Schiller's corporate credit card bill directly, as it did for other EXXI senior executives, often before he submitted expense reports to the accounting department as required by his employment agreement and EXXI policies and procedures.

56.     In violation of company policies, Schiller submitted expenses that were
unreasonable, personal in nature, and/or not supported by sufficient documentation, including, for
example:

- $40,000 for his share of a group purchase of a $160,000 bottle of wine that Schiller
  purchased with other oil and gas industry executives at a charity auction;

- $36,000 for a shopping trip to a designer shoe boutique taken by the spouses of board
  members and senior officers, including Schiller's wife, during a board meeting in New
  York;

- $15,000 for a birthday party for the wife of a college football coach that Schiller and his
  wife hosted at their ranch for over 200 guests including some oil and gas industry
  executives;

- $43,000 for use of EXXI's company aircraft to attend a football game featuring his college
  alma mater with some other industry executives;

- $15,000 for a charitable donation to the private school of Schiller's daughter;

- $17,000 for legal fees relating to personal matters;

- $323,000 to keep the "Denny Crane Room"—a private bar in EXXI's executive office suite
  to which only a dozen or so persons had keycard access and which could be used for
  entertaining EXXI employees and guests—stocked primarily with liquor and cigars, from
  2012-2016; and

- $18,000 for first class tickets for Schiller's wife and minor daughter to travel to London,
  England to attend a company board meeting to which board member spouses were invited.

57.     From 2012 until 2016, EXXI paid Schiller perquisites, personal expense
reimbursements and other items of value without disclosing such items as compensation in its
definitive proxy statements.  Each year, Schiller reviewed and assisted with the preparation of
EXXI's definitive proxy statements, including the executive compensation sections.   EXXI's
proxy statements did not disclose all of the perquisites received by Schiller for the years 2012
through 2016.  For each year, Schiller signed proxy solicitation materials which were sent to
investors which included a copy of the definitive proxy statement.

58.    EXXI incorporated its definitive proxy statements into its annual reports by reference.  Schiller reviewed and signed these annual reports.

**D.    Schiller's Failure to Disclose the Loans Resulted in EXXI Making Misleading Filings with the Commission**

59.    On December 19, 2014, Schiller obtained money by selling 150,000 EXXI shares (75,000 shares at $3.15 per share and 75,000 shares at $3.22 per share) from his personal accounts.

60.    Schiller unreasonably failed to disclose loans with Vendors A, B, and C in connection with EXXI's 2014 definitive proxy statement as evidenced by the following: (a) obtaining loans from the Vendors in exchange for awarding EXXI business while he was the president, CEO, and chairman of the board; (b) having notice, as reflected in numerous emails with the Vendors, that they expected EXXI business in return for the loans; (c) encouraging EXXI employees to award contracts to these Vendors; and (d) failing to disclose the Vendor A loan in a questionnaire that asked for related party transactions, potential conflicts of interest, and relationships with people who did business with EXXI.

61.    Schiller unreasonably failed to disclose the Louie loan to EXXI despite having notice that the company intended to publicly disclose in an 8-K filing that there were no "understandings or arrangements between Louie and any other person" pursuant to which he was selected to serve on EXXI's board.  Schiller should have known that this statement was inaccurate and misleading by omission because the $3 million loan between Louie and Schiller constituted an understanding and/or an arrangement that, at a minimum, compromised Louie's ability to serve as an independent director of EXXI's board.  Schiller reviewed the disclosure before it was filed but failed to disclose the loan.  Schiller also knew that Louie had not

completed the officer and director questionnaire, which would have elicited disclosure of the loan because it asked for *any conflict or potential conflict of interest* involving Louie and any person subject to EXXI's conflict of interest policy.  Finally, Schiller did not disclose the Louie loan after receiving legal advice that a loan with a board member may be a disclosable event.

### FIRST CLAIM
### (Schiller violated Securities Act Sections 17(a)(2) and 17(a)(3))

62.     Plaintiff realleges and incorporates by reference paragraphs 1 through 61 above.

63.     Section 17(a)(2) [15 U.S.C. §§77q(a)(2)] prohibits anyone from directly or indirectly obtaining money or property in the offer or sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Section 17(a)(3) [15 U.S.C. §§77q(a)(3)] prohibits any act, practice or course of conduct that operates or would operate as a fraud or deceit upon the purchaser.

64.     Through the conduct described above concerning the three undisclosed related party transactions and the Louie loan in paragraphs 8 through 50 and paragraphs 59 through 61 above, in the offer or sale of securities and using instruments of interstate commerce or the mails, Schiller (a) obtained money or property by means of untrue statements of material facts necessary to make the statements made not misleading and (b) engaged in transactions, practices and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

65.     Schiller failed to exercise reasonable care with regard to this conduct and consequently was negligent.

66.     By reason of the foregoing, Schiller violated, and unless enjoined, is likely to continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§77q(a)(2) and (3)].

### SECOND CLAIM
### (Proxy Violations)

67.     Plaintiff realleges and incorporates by reference paragraphs 1 through 66 above.

68.     Section 14(a) of the Exchange Act [15 U.S.C. §78n(a)], makes it unlawful to solicit any proxy in respect of any security (other than an exempted security) registered pursuant to Section 12 of the Exchange Act in contravention of such rules and regulations as the Commission may prescribe.  Exchange Act Rule 14a-3 [17 C.F.R. §240.13a-3], prohibits the solicitation of proxies without furnishing proxy statements containing the information specified in Schedule 14A, including executive compensation disclosures pursuant to Item 402 of Regulation S-K [17 C.F.R. §229.402].  Exchange Act Rule 14a-9 [17 C.F.R. §240.14a-9], prohibits the use of proxy statements containing materially false or misleading statements or materially misleading omissions.

69.     Through the conduct described above concerning the three undisclosed related party transactions in paragraphs 8 through 35 above and concerning the undisclosed perquisites and compensation in paragraphs 51 through 58 above, Schiller sent EXXI shareholders soliciting materials containing materially false or misleading statements or materially misleading omissions in the fiscal years 2012, 2013, 2014, 2015, and 2016.  Schiller thereby violated, and unless enjoined, will continue to violate Section 14(a) of the Exchange Act [15 U.S.C. §78n(a)], and Rules 14a-3 and 14a-9 [17 C.F.R. §§240.14a-3 and 240.14a-9], thereunder.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

(a) permanently enjoin Defendant from violating, directly or indirectly, Securities Act Sections 17(a)(2) and (3) [15 U.S.C. §77q(a)], Exchange Act Section 14(a) [15 U.S.C. §78n(a)] and Exchange Act Rules 14a-3  [17 C.F.R. §240.14A-3]  and 14a-9 [17 C.F.R. §240.14a-9];

(b) pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. §78u(d)(5)], prohibit Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. §78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. §78o(d)];

(c) pursuant to Securities Act Section 20(a) [15 U.S.C. §77t(a)] and Exchange Act Section 21(d)(3) [15 U.S.C. §78u(d)(3)], order Defendant to pay civil money penalties;

(d) grant any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. §78u(d)(2)]; and

(e) grant such other relief as the Court may deem just and appropriate.


Dated: July 16, 2018                                      Respectfully submitted,


/s/ Nicholas A. Brady
NICHOLAS A. BRADY
D.C. Bar No. 484612
S.D. Tex. ID No. 27124
Attorney in Charge

Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5949

Telephone: (202) 551-4732
Facsimile: (202) 772-9367
bradyn@sec.gov

Of Counsel:

Charles D. Stodghill
Anita B. Bandy
Janene M. Smith
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5949
Telephone: (202) 551-4413